# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>D.C.,<br><br>Appellant. | No. 78636-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: September 16, 2019 |

APPELWICK, C.J. — D.C. challenges a trial court's order involuntarily committing him for up to 90 days of mental health treatment. He contends that insufficient evidence supports the trial court's finding that he was gravely disabled. We affirm.

## FACTS

Alison Murphy has lived in a house on 123rd Place Southeast in Bellevue, Washington with her young daughter since 2009. On March 23, 2018, Murphy came home and found D.C. going through her mailbox. Murphy did not know D.C. and had never seen him before. When Murphy asked what he was doing, D.C. mumbled, "This is my house, this is my house." Murphy asked D.C. to leave. When he did not, Murphy attempted to drive into her garage and close the door, but D.C. wedged his foot in the automatic garage door to stop it from closing and followed Murphy into her garage. D.C. continued to insist that it was his house.

Murphy called 911. Law enforcement officers removed D.C. from the property and told him not to come back. Nevertheless, D.C. returned to Murphy's home on March 28, 2018 and March 30, 2018. Each time, D.C. attempted to

forcibly enter the home believing it to be his own. On both occasions, law enforcement responded, repeatedly informed D.C. that it was not his home, and instructed him not to return.

The State filed a petition to involuntarily commit D.C. for mental health treatment for a period of up to 14 days. The petition alleged three grounds for commitment:

As a result of [a] mental disorder, respondent presents:

_X_     a likelihood of serious harm to self, in that a substantial risk exists that physical harm will be inflicted by the respondent upon his/her own person as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self or;

_x_     a likelihood of serious harm to others and/or others' property, in that a substantial risk exists that physical harm will be inflicted by respondent upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, and/or substantial risk that physical harm will be inflicted by the respondent upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others or;

_x_     is gravely disabled in that respondent, as a result of a mental disorder, is in danger of serious physical harm, resulting from a failure or inability to provide for his/her essential human needs of health or safety and/or manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his/her actions and is not receiving such care as is essential for his/her health or safety.

Following an evidentiary hearing, the trial court entered an order committing D.C. for up to 14 days at Cascade Behavioral Health Hospital. The trial court found that D.C. presented a likelihood of serious harm to others and was gravely disabled under "[p]rong B," referring to RCW 71.05.020(22)(b). The trial court found

2

"insufficient the evidence of GD-A [(grave disability, prong A)]," referring to RCW 71.05.020(22)(a).

At the expiration of the 14 day period, the State petitioned for an additional 90 days of commitment, alleging that D.C. was gravely disabled as defined in both RCW 71.05.020(22)(a) and (b).[1]

At the hearing on the State's petition, the State presented the testimony of Hyemin Song, a licensed clinical social worker at Cascade. Song evaluated D.C. for the purposes of the commitment hearing by performing an in-person interview and reviewing D.C.'s medical chart.

Song testified that D.C. had been diagnosed with major depressive disorder and neurocognitive impairment disorder. According to Song, D.C. was calm and cooperative during the evaluation, but "appeared very despondent" and had a flat affect. Song concurred with the opinions of several other medical professionals that D.C. showed substantial short-term memory loss. D.C. was frequently confused and disoriented. He did not know what date it was, where he was, or why he was in the hospital. D.C. needed frequent reminders to eat meals and use the bathroom or he would fail to do so.

D.C. told Song he wanted to leave the hospital. Song asked where D.C. would go and D.C. gave the address of Murphy's home, which Song learned was D.C.'s childhood home. When Song told him that he didn't live there and could not go there, D.C. said, "I don't remember that."

---

[1] The petition also alleged that D.C. presented a likelihood of serious harm to others, but the State abandoned that allegation at the hearing.

The prosecutor asked Song if D.C. was able to provide for his own essential needs. Song responded,

> Because of his cognitive deficits that includes disorientation, confusion, and short-term memory impairment. He's -- he presents as quiet, confused, and disoriented, not having the -- any awareness into his environment. And at some points, on and off, he's not even aware of his incontinency and needing prompts and reminders and sometimes physical assistance to care for his personal hygiene issues. He has been repeatedly told that he cannot return to the family home that he lived in his childhood, and -- but he doesn't remember and retain that information because of the cognitive deficits. And that he believes that he can return there. He mentioned that in the case of emergency, he could not articulate how to avoid any unsafe situations. He stated that he would just go home and that was what he would do. Based on the incident that happened prior to coming to the hospital, that he was repeatedly showing up and not being able to be redirected, not show up at the residence, he still continues with the belief because of the cognitive deficits again, and that he is not able to make his reasonable self-care planning at this time.
>
> . . . .
>
> . . . Given that he needed reminders for meals and medications, I do not believe that he can initiate his own schedule and -- and then, following the recommended schedule of medications.

The prosecutor also asked Song if D.C. was exhibiting a deterioration in routine functioning. Song testified that, before he was hospitalized, D.C. had his own apartment and appeared to be able to provide for his own basic needs with the help of a financial guardian. But, Song stated that D.C. had experienced a significant decline in his ability to care for himself:

> I think based on the information that I have from the social work collateral, it sounds like if [D.C.] wasn't able to live on his own, with some assistance managing his financing, his apartment in SeaTac, at this point -- from that point, I've -- he's functioning. I do believe that he deteriorated to a point that he was completely not aware of his residence and that he retreated back to the memory that he has in the past, and that he's living in that past. So therefore, I believe

that his cognitive ability has deteriorated and that negatively affected his level of function at this point.

Song testified that D.C. was not currently stable enough to be transferred to an assisted living facility outside of the hospital setting.

The trial court concluded that D.C. was gravely disabled as defined by both RCW 71.05.020(22)(a) and (b), and entered an order committing him for an additional 90 days. The trial court later entered supplemental findings of fact supporting its commitment order. They provide, in relevant part, as follows:

12. The Respondent currently suffers from a mental and an organic disorder, specifically: major depressive disorder and a neuro-cognitive impairment disorder.

13. The Respondent's neurocognitive impairment disorder has had a substantial adverse effect upon Respondent's cognitive and volitional functioning.

14. As a result of this neurocognitive impairment disorder, the Respondent is gravely disabled and at substantial risk of harm due to his inability to provide for his essential needs of health and safety; as well as he is manifesting severe deterioration in routine functioning as evidenced by repeated and escalating loss of cognitive and volitional control over his actions and is not receiving care outside the hospital essential to his health and safety.

15. The Respondent's neurocognitive impairment disorder is impairing his ability to remember and understand that he no longer lives in his childhood home located at 4866 123rd Pl SE, Bellevue WA 98006.

16. The Respondent's neurocognitive impairment is impairing his ability to be safe in the community. Since March 23, 2018, the Respondent has attempted to forcibly enter the home located at 4866 123rd Pl SE, Bellevue, on three occasions, despite being forcibly removed by the police and being told not to return to the home because told [sic] the home is now owned and occupied by Allison Murphey [sic].

17. The Respondent is unable to provide for his essential human need of a home/shelter because of the neurocognitive impairment disorder. The Respondent lacks the ability to understand the world around him and where he lives. He continues to believe that he lives in the home now owned by Allison Murphey [sic] and, if released from the hospital, he said he will return to that home.

18. The Respondent is in danger of serious physical harm by returning to this home.

19. The Respondent's neurocognitive impairment disorder has caused a severe deterioration in routine functioning. Ms. Murphey [sic] has lived at 4866 123rd Pl SE, in Bellevue since 2009. The Respondent did not claim to live at Ms. Murphey's [sic] home prior to March 2018, and since then, he has attempted to forcibly enter her home on three occasions. His attempts to enter the home are escalating, despite being physically removed from the premises by police.

20. The Court finds that without further treatment, Respondent will continue in the condition that brought him into [the] hospital, and that a less restrictive treatment alternative is not appropriate nor in Respondent's best interests because he is not stabilized and requires treatment in a locked memory care facility.

D.C. appeals.[2]

## DISCUSSION

The sole issue on appeal is whether the State presented sufficient evidence to prove that D.C. was gravely disabled. D.C. argues that the trial court's conclusion that he was gravely disabled rested on several unproven findings. We conclude substantial evidence supports the superior court's finding that D.C was gravely disabled under both definitions.

The burden of proof at a 90 day involuntary commitment hearing is "clear, cogent, and convincing evidence." In re Det. of LaBelle, 107 Wn.2d 196, 209, 728

---

[2] Though the commitment order at issue has since expired, the parties agree that the issue is not moot.

P.2d 138 (1986). This standard of proof means that the ultimate fact in issue must be shown by evidence to be "'highly probable.'" Id. (quoting In re Interest of Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). We review the trial court's decision to determine whether substantial evidence supports the findings of fact and whether those findings in turn support the court's conclusions of law. Id. Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015). "The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence." In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd, 138 Wn.2d 898, 982 P.2d 1156 (1999).

An individual committed for an initial 14 day period of intensive treatment may be committed for an additional 90 days if that person is "gravely disabled." RCW 71.05.280(4). RCW 71.05.020(22) sets forth two alternative definitions of gravely disabled, either of which provides a basis for involuntary commitment:

> [A] condition in which a person, as a result of a mental disorder, or as a result of the use of alcohol or other psychoactive chemicals: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

D.C. first contends that the State failed to prove grave disability as defined in RCW 71.05.020(22)(a) because there was no evidence regarding his ability to meet his basic needs if released from the hospital.

"Grave disability" as defined in RCW 71.05.020(22)(a) requires the State to show "recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment." LaBelle, 107 Wn.2d at 204-05. D.C. suffered from significant confusion and memory loss due to an unspecified cognitive impairment. As a result, he was unable to provide for his own essential needs outside a hospital setting. While D.C. stated that he wanted to "go home," he could not identify where that home was. Instead, D.C. repeatedly stated his intention to return to Murphy's home. No amount of explanation that he did not live there would dissuade him. He was unable to articulate any other plan for shelter or his own safety.

Moreover, D.C. did not understand why he was in the hospital or why he was prescribed medication. He was frequently incontinent and needed reminders to use the bathroom. He also needed reminders to eat regularly. Song testified that D.C. would be in danger of serious physical harm due to his inability to keep himself clean, hydrated, and fed.

LaBelle is instructive. In that case, the State presented evidence that an individual, suffering from cognitive impairment and memory loss, was not oriented to his surroundings, could not manage his own hygiene, and could not plan for his own care:

> The unrebutted evidence adduced at the hearing indicates that LaBelle suffered from severe cognitive and functional impairment as evidenced by impaired memory loss, inability to respond appropriately to questions, and disorientation. Although there was evidence that LaBelle's condition had stabilized or improved slightly while in the hospital, the evidence also indicated

that LaBelle's disorientation and mental impairment remained such that he was unaware of his surroundings much of the time.

The evidence also indicated that LaBelle would not receive such care as is essential for his health and safety if released. His deterioration was such that he lacked awareness of hygiene and routine care and was unable to form realistic plans for taking care of himself outside the hospital setting other than resuming a lifestyle of living on the streets without adequate food and shelter. Although uncertainty of living arrangements or lack of financial resources will not alone justify continued confinement in a mental hospital, the evidence here indicates that LaBelle's plans to live on the streets are not the result of a choice of lifestyle but rather a result of his deteriorated condition which rendered him unable to make a rational choice with respect to his ability to care for his essential needs.

LaBelle, 107 Wn.2d at 210. The court concluded that this was sufficient evidence to support a finding of grave disability. Id. We similarly conclude that the finding that D.C. was gravely disabled under RCW 71.05.020(22)(a) was supported by sufficient evidence.

D.C. next asserts that the State failed to prove grave disability as defined in RCW 71.05.020(22)(b). He contends that "there is no basis to assess whether any 'loss' of cognitive or volitional controls had occurred because there is no baseline information to compare with his current functioning ability."

To establish that a person is gravely disabled under RCW 71.05.020(22)(b), the evidence "must include recent proof of significant loss of cognitive or volitional control[, and] must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health and safety." LaBelle, 107 Wn.2d at 208. RCW 71.05.020(22)(b) represents a legislative attempt to permit "intervention before a mentally ill person's condition reaches crisis proportions," as it "enables the State to provide the kind of

9

continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning." Id. at 206.

Here, D.C.'s behavior towards Murphy was evidence of recent and significant loss of cognitive or volitional control. Though Murphy had lived in D.C.'s childhood home since 2009, it was not until 2018 that D.C. repeatedly began showing up and trying to enter the home, convinced that it was his. D.C. had, at some recent point, lived in his own apartment and managed his own basic needs. However, Song testified that D.C. was currently unable to care for himself due to his worsening memory loss. Accordingly, the trial court could reasonably have found by clear, cogent, and convincing evidence that D.C. was gravely disabled under RCW 71.05.020(22)(b).

D.C. also challenges specific findings of fact made in the trial court's oral ruling that he alleges were not supported by the evidence.[3] He first challenges a finding that he "lacks the inability [sic] to provide for essential human needs such as shelter and safety." But, this finding was supported by Song's testimony that D.C. continued to insist he would return to Murphy's home and that he was otherwise unable to plan for his own basic needs.

D.C. contends the evidence did not support the trial court's finding that he "has manifested, as a result of his mental disorder, a severe deterioration in routine function." But, it was reasonable for the trial court to find that D.C.'s behavior at Murphy's home was a sign that his cognitive abilities were deteriorating. And, it

---

[3] The trial court incorporated its oral findings into its written findings by reference.

was undisputed that by the time D.C. was hospitalized, his functioning was extremely impaired. This finding was also supported by the evidence.

D.C. also challenges the trial court's finding that he was "not receiving such care that is essential for his health or safety when he is not in the hospital." But, as discussed above, the evidence showed that D.C. was not likely to receive, if released, the necessary care for his health and safety. D.C. did not know where he would go, did not understand why he was taking medication or what it was for, and could not manage his own hygiene or nutrition without help. The trial court's finding was supported by the evidence.

The trial court also made a finding that D.C. had "lost track" of where he lived. D.C. argues that "there was no substantive evidence presented indicating he had forgotten about his actual home." But, D.C. was repeatedly asked in the hospital where he lived, and he was unable to give any address but Murphy's. This finding was also supported by the evidence.

Finally, D.C. challenges the trial court's finding that

> Ms. Song also believed, and I find credible, that the respondent previously could manage himself at his own apartment based on the information she had and that that is the basis for her to conclude that he has severely deteriorated under prong B, that he had manifested a severe deterioration, and there was repeating and escalating loss of cognitive or emotional controls.

D.C. argues that Song's opinion was merely speculation. But, Song inferred that D.C.'s living situation had previously been stable from his medical records, which showed that D.C. had a financial guardian to help pay his rent and bills. The court found this opinion credible. And, we defer to the trier of fact on the

11

persuasiveness of the evidence and witness credibility. In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

Affirmed.

Appelwick, C.J.

WE CONCUR: